## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH BENNETT,

               *Plaintiff,*

   v.

SEPTA, et al.,

               *Defendants.*

CIVIL ACTION
NO. 23-1271

**Pappert, J.**                                                          **February 2, 2024**

### <u>MEMORANDUM</u>

Longtime SEPTA employee Deborah Bennett sued her employer and a former supervisor, Scott Sauer, alleging race discrimination, hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act. Bennett's allegations stem from a string of incidents that took place between 2020 and 2023. Among them, Bennett, who is black, contends Sauer, who is white, discriminated against her when he reduced her proposed Fiscal Year 2021 merit increase from 4.5% to 3.5%, confronted her about "excessive" overtime usage and transferred her to work under a different supervisor. Bennett further contends that her 3% raise for Fiscal Year 2022, less than she felt she deserved, was discriminatory and retaliatory.

SEPTA moves for summary judgment contending Bennett's case collapses under its own weight. In fact, Bennett's case weighs very little and the record supports SEPTA's assessment. There is no evidence from which a jury could reasonably find for Bennett on any of her claims. Specifically, there is nothing to show that Bennett's race

played any role in anything Sauer or anyone else at SEPTA did or didn't do.  To the contrary, Bennett repeatedly attributed her issues with Sauer to everything but race—whether it be an interaction at the 2020 Philadelphia Flower Show or that Sauer's treatment of her made her "collateral damage" from an apparent feud between Sauer and her former manager, Joseph Brennan.  And to the extent Bennett can establish a *prima facie* case on any of her retaliation claims, SEPTA had legitimate, non-discriminatory reasons for its actions and nothing in the record would allow reasonable jurors to either disbelieve those reasons or conclude they were pretext for illegal discrimination.

After thoroughly reviewing the record, the parties' submissions and holding oral argument, the Court grants the Defendants' motion and enters judgment in their favor.

I

A

Bennett started at SEPTA in 2000 working at a service desk.  (Bennett Dep. 9:13–10:14, ECF No. 15-4); (Def's SUMF, ECF No. 15-3, ¶ 1).  In 2014, she became an Administrative Assistant II and worked under the Chief of Vehicle Maintenance, Joseph Brennan.  (Def's SUMF ¶ 6); (Pl's SUMF, ECF No. 16-2, ¶ 6).  Bennett enjoyed working for Brennan and performed her job ably; in her annual performance reviews, Brennan rated her as "Meets Expectations" every year from 2015-2021.  (Def's SUMF ¶¶ 14–30).

Each year, SEPTA employees are eligible for a salary merit increase, and the amount they ultimately receive is based on their performance assessment and whether their salary is above or below their position's midpoint.  (SAM FY 2021 Merit Increase,

2

ECF No. 15-20, at 1–2).[1]  For example, in Fiscal Year 2021, an employee who received a "Meets Expectations" review and whose salary was below their position's midpoint was eligible to receive a 2.75-4.5% merit increase.  (*Id.* at 1).  Employees who were rated as "Exceeds Expectations" were eligible for a higher percentage increase (up to 5.5%), whereas employees who were scored as "Needs Improvement" were eligible for a lower range of increase.  (*Id.*)  Between 2015 and 2019, Bennett's merit increases ranged from 1% in 2017 to 4% in 2016, and she received a 2.5% merit increase in 2015, 2018 and 2019.  (Def's SUMF ¶¶ 15, 19, 22, 26, 28); (Pl's SUMF ¶¶ 15, 19, 22, 26, 28).  Bennett never alleged those raises were discriminatory.  (Bennett Dep. 31:2–45:18).

### B

In March 2020, Bennett served as the lead ambassador for SEPTA at the Philadelphia Flower Show.  (*Id.* at 121:24–124:5).  In this role, she was responsible for guiding other SEPTA employees to their assigned areas.  (*Id.* at 121:24–122:5).  One of those employees was then-Assistant General Manager Scott Sauer, who was standing with another colleague in a section called platform "A."  Bennett approached him and said, "Excuse me, but, Scott, you belong in the 'B' section."  (*Id.* at 122:6–11).  According to Bennett, Sauer "laughed it off" and walked to his assigned section, but later, Sauer returned to the "A" section and his administrative assistant, Trayia Hill, purportedly said, "Oh, I thought you were the AGM.  I guess [Bennett] showed you."  (*Id.* at 122:12–19).  Bennett contends Sauer's "entire demeanor" changed after this incident.  (*Id.* at 123:3–4).

---

[1]     All page numbers are referring to the ECF page number.

Later that year, Bennett received another "Meets Expectations" review from Brennan and he recommended she receive a 4.5% merit increase for Fiscal Year 2021. (Def's SUMF ¶ 30). Before the merit increase took effect, however, Sauer reduced it to 3.5%, (Def's SUMF ¶ 31), something he has discretion to do every year for budgetary reasons; there were years when he "adjusted" up to 100 employees' recommended increases. (Sauer Dep. 30:17–23, 85:2–5, 102:17–18, ECF No. 15-21). Brennan testified he was "not aware" of Sauer reducing anyone else's merit increase in his department, (Brennan Dep. 26:2–15, ECF No. 16-5), and Bennett heard "rumors" that another administrative assistant, Mariellen Medernach, a white woman who had been in the position for just 2 years, received a 4.5% merit increase. (Bennett Dep. 142:19–143:7).

C

In February 2021, another administrative assistant, Desiree Saunders, was promoted to a new position, (Brennan Dep. 11:1–12:24), and SEPTA decided not to fill Saunders' position but rather reallocate the work to existing employees. (*Id.* at 12:10–24). Brennan asked Bennett if she could perform the additional work created by Saunders' promotion, and she agreed to work roughly twenty additional hours per week, on top of her responsibilities for Brennan. (*Id.* at 13:7–18). For those additional hours, Bennett received overtime pay, which allowed her to earn more money: she worked 88 hours of overtime in April and 109 hours of overtime in May. (Bennett Overtime Hours, ECF No 15-22, at 2); (Brennan Dep. 14:1–24).

On June 7, 2021, Brennan went out on medical leave. (Brennan Dep. 15:8–11). Looking for ways to limit overtime usage consistent with SEPTA objectives, (Herman Cert., ECF No. 15-23, ¶ 28), Sauer met with Bennett in his office on June 22, 2021 to

4

discuss her "excessive" overtime.  (Bennett Decl., ¶ 13, ECF No. 16-5).  Bennett says

Sauer accused her of stealing hours and "belittled and embarrassed" her in front of his

staff.  (*Id*.)  Sauer says he never yelled at her or accused her of stealing time.  (Sauer

Dep. 35:22–36:3); (Herman Cert. ¶¶ 21–25).  Nonetheless, after the meeting, Bennett

was "visibly upset."  (Coppedge Dep. 21:4–22:18, ECF No. 16-5).  Later in the day,

Bennett received an email from Leslie Moore, stating, "If you need assistance with your

workload, don't hesitate to let me know what it is so that I can help alleviate the load."

(Moore June 23 email to Bennett, ECF No. 15-29, at 2).  Bennett responded, "My daily

workload is suitable for me.  I required overtime for a workload from which was left by

another employee and supporting the Vehicle Engineering group.  I was advised by

Scott to terminate the assignment.  I can and will continue to focus on the assignments

that fall under my job description."  (*Id*.)

     Still bothered by her meeting with Sauer, however, Bennett emailed SEPTA's

EEO department on July 1 saying she felt "subject to an atmosphere of workplace

harassment and intimidation from Scott Sauer . . . as a result of the ongoing conflict

between himself and my supervisor, Joseph Brennan . . . ."  (Bennett July 1 email to

Hopkins, ECF No. 16-6, at 12).  She added that she believed Sauer "had a dislike for me

since . . . the Philadelphia Flower Show."  (*Id*.)  Bennett also noted that Sauer changed

her 2021 salary merit increase from 4.5% to 3.5%, which made her feel like she had

"been hit with multiple punches that are directed at me as a result with AGM Sauer's

conflict with Joseph Brennan."  (*Id*. at 13).

     Five days later, Bennett's email morphed into a formal complaint.  (July 6 EEO

Compl., ECF No. 16-6, at 17–22).  Echoing many of her prior sentiments, Bennett

alleged that her encounter with Sauer was "collateral damage" from an apparent feud between Brennan and Sauer as well as harassment and retaliation for the Flower Show incident. (*Id.* at 18). Bennett wanted an apology, but she also said, "I would like to have my 1% increase retro . . . Mariellen Medernach (who is white) was given her 4.5% increase and she has only been an AAII for approximately two years." (*Id.* at 22). Ten days later, Bennett followed up with SEPTA's EEO department, where she said she was "a little baffled" because she had been receiving phone calls about her claim yet had not been interviewed. (Bennett July 16 email to Hopkins, ECF No. 16-6, at 23).

Following their June meeting, Sauer attempted to reduce Bennett's overtime hours by minimizing unnecessary work. For instance, he emailed Jessica Herman (then Mangold), Mike Civera and Leslie Moore on July 30, stating, "I offered Deborah assistance from Operations Admin in prioritizing her work. She was told not to worry about mistakes that she was correcting from Desiree Saunders." (Late July/Early August 2021 emails, ECF No. 16-6, at 25). Dennis McAnulla told Bennett, "You no longer have to keep [COVID spreadsheets]," (*id.* at 29), as did Herman, "We don't need regular spreadsheets." (*Id.* at 28).

Bennett struggled with the uncertainty surrounding what was expected of her, causing her stress. She felt there was "no consistency" in her work and thought Sauer was overly monitoring her. She believed Sauer thought she was "creating work just to get overtime." (Bennett email to Keyes, ECF No. 16-6, at 30). Still, she worked 16 hours of overtime in August and 8.5 hours in September. (Bennett Overtime Hours, ECF No. 15-22, at 2). She contacted her union representative, Michael Keyes, who told her "it seems you are in an extremely bad situation" and to seek clarity from Sauer as

6

to what he expected her to do.  (*Id*.)  At some point, Bennett also filed a grievance against Sauer, alleging a hostile work environment stemming from the June meeting. (Keyes Dep. 7:22–10:8, ECF No. 16-5).

With Brennan gone, Civera and McAnulla back-filled Brennan's position and supervised Bennett.  (Bennett Decl. ¶ 12).  During August 2021, Sauer emailed McAnulla and said:

> I still don't understand why the AA needs so much overtime.  I would like a detailed accounting of the "extra" work that we need completed causing us to require so much overtime of her.  Within that detail, I need an estimate of the time it takes to perform the tasks.  If you still reach the conclusion that she needs overtime then I want you to reassign work to other people within Vehicle Maintenance to keep that overtime at zero.
>
> No other Administrative Assistant in Operations is required to work overtime like this and we have other AA's that are serving multiple supervisors as well.

(ECF No. 16-7, at 12); (McAnulla Dep. 28:13–24, ECF No. 16-5).  McAnulla accordingly told Bennett that "until further notice she couldn't work overtime," and he told her to "write down her daily job duties, what she was doing each day and the amount of work that she was performing each day so we can provide a justification to support the need for overtime."  (*Id*. at 15:16–16:3).  According to McAnulla, Bennett "chose that she didn't want to work the overtime and she didn't . . . want to provide [McAnulla] the justification, so that was kind of the end of it."  (*Id*. at 16:4–8).

In early August 2021, Bennett was interviewed by Ekaette Oduok, SEPTA's EEO/Employee Relations Manager, pursuant to Bennett's July 6 internal complaint. Based on that interview, Oduok drafted a statement on Bennett's behalf.  (Proposed EEO Statement, ECF No. 16-6, at 33–38).  Regarding Sauer's change of her merit

increase from 4.5% to 3.5%, the letter said, "I never asked Scott about why the change occurred because I thought it was related to the Flower Show." (*Id.* at 35–36). Bennett alleges that Oduok did not accurately capture her statement yet wanted her to sign it despite Bennett's attempts to make corrections. (Bennett emails to Oduok, ECF No. 16-6, at 39–49). Though she claimed Oduok misrepresented her version of events, in her proposed corrections, Bennett *again* stated, "I feel that I didn't get the full merit because of the Incident at the flower show," not because of anything having to do with her race, though she again references her belief that Sauer did not reduce Medernach's merit increase. (Proposed Corrections, ECF No. 16-7, at 8).

Bennett's work-related stress led to her taking sick leave from September 9 to December 8, 2021. While away from the office, Bennett, on October 8, complained to SEPTA's Assistant General Manager for Human Resources, Stephanie Deiger, and SEPTA's General Manager, Leslie Richards, about alleged bias in Oduok's investigation. (Bennet. Decl. ¶ 20). Bennett said that Sauer bullied everyone, regardless of race, and was upset that none of the witnesses she identified, including white men Dennis McAnulla, Mike Civera and Mike Wright, and a black man, Jeff Coppedge, were interviewed in Oduok's investigation. (*Id.* ¶ 20); (Bennett Dep. 149:25–150:18). Moreover, Bennett stated it was her belief they were "not being told what is really going on in Vehicle Maintenance and how everyone is being bullied by AGM Sauer. Mr. McAnulla told me and others that he would tell people the truth but is afraid of the retaliation." (Bennett Oct. 8 email, ECF No. 16-7, at 17). On November 3, 2021, Bennett filed a charge of discrimination with the Equal Employment Opportunity Commission, and on November 5, 2021, a complaint with the Pennsylvania Human

Relations Commission and the EEOC, alleging race and age discrimination and retaliation.  (Bennet Decl. ¶ 21); (PHRA Complaint, ECF No. 16-7, at 23–27).

D

When Bennett returned from sick leave in December 2021, Sauer became her direct supervisor.  But for the rest of the year, she only worked Mondays because she had vacation time she needed to use.  (Bennett Dec. 8 email to Herman, ECF No. 16-7, at 32).

In January, Bennett emailed Deiger that she had not received her merit increase for the year, noted her pending EEOC and PHRA claims and said she did not feel comfortable with Sauer giving her a fair and accurate performance review and merit increase recommendation.  (Bennett Jan. 5 email to Deiger, ECF No. 16-7, at 34); (Herman emails, ECF No. 16-7, at 35–36).  About a week later, Bennett received a 3% merit increase, which she disagreed with because two white men, Mike Civera and Ed Carruthers, received "Exceeds Expectations" reviews while allegedly performing two jobs.  Bennett believed this to be retaliation for filing the EEOC charge, and further complained that she had not received a performance evaluation.  (Bennett Jan. 12 email to Deiger, ECF No. 16-7, at 42).  However, in a February 23, 2022 letter, which Bennett confirmed receiving, SEPTA informed Bennett the reason for both the delayed raise and its amount.  (Bennett Dep. 200:1–22).  SEPTA explained that because Bennett was on sick leave during the fall of 2021, she was absent for the merit consideration process, and according to SEPTA's policy, she received an increase amount that was set at the average for employees with a "Meets Expectations" rating. (*Id.* at 200:12–21).

9

On March 25, 2022, Bennett filed an EEOC charge of race discrimination, where she again alleged that Sauer accused her of fabricating work to qualify for overtime and reduced her merit increase but allegedly did not do the same for Medernach.  (EEOC Charge, ECF No. 16-7, at 46).  SEPTA filed its position statement on November 1, 2022, and Bennett filed a rebuttal letter on November 21.  (ECF No. 16-7, 48–54).

E

For roughly a year, Bennett had little to no contact with Sauer aside from a few emails where she requested time off, which he granted.  (Sauer Nov. 21 email, ECF No. 15-41, at 2); (ECF No. 16-8, at 46–48).  Bennett claims Sauer started excluding her from email communications, so she received assignments from "third parties."  (Bennet Decl. ¶ 19).  But Sauer already had an administrative assistant and did not need another, (Sauer Nov. 21 email, ECF No. 15-41, at 2), and so in November 2022, Sauer emailed Carol O'Neal, the Director of SEPTA's EEO Department, saying:

> You'll probably recall that I never met with Deborah Robinson-Bennett about her performance review last year.  She still received her merit last year but the rule is that we don't award merits without a completed evaluation.  I have a performance review for Deborah Robinson-Bennett this year.  Deborah has been reporting to me since June 2021.  We haven't had much interaction though.  Aside from a few emails from Deborah requesting time off, I haven't really had much interaction with her.  I scored her Meets Expectations.  I plan to conduct the 1:1 Meeting but I think I'll need assistance with that.
>
> I also need to speak with someone about having Deborah report to someone else for the coming year.  I have no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction.  She's completing her routine work but there's nothing else for her to do without a manager directly supervising her.

(*Id.*)

10

Bennett similarly felt detached from Sauer and his team.  In December 2022, he invited his staff to a holiday breakfast, but Bennett received an email from Sauer's assistant cancelling the invitation and Bennett did not attend.  (Holiday Breakfast Invitation, ECF No. 16-8, at 1–3).  In February 2023, Sauer again raised the issue of Bennett:

> We need to discuss Deborah's position.  She's technically reporting to me. She needs to be relocated to another management center.  Her supervisor's position is eliminated.  I don't want to let another year go by where she's working unsupervised.  Can we try to bring a resolution to this next week?

(Sauer Feb. 1 email, ECF No. 15-43, at 2).  SEPTA employees, including Sauer, can be transferred "involuntarily" based on need, (Sauer Dep. 100:17–24), but O'Neal participated in the transfer process to ensure that Bennett would get the same salary, benefits and pension.  (O'Neal Cert., ECF No. 15-47, at 3).

At the time, Cassandra West, the newly promoted assistant COO of Customized Community Transportation (CCT), needed an administrative assistant. (West Dep. 89:15–20, ECF No. 15-45).  So in March 2023, Bennett was transferred to work under West, a position Bennett did not apply for and considered "less desired." (Bennett Decl. ¶ 28).  Bennett was paid at her existing grade 36, though she thought it should be compensated at a higher grade because employees who had done similar work were paid at higher levels.  (Bennett Mar. 9 email to Keyes, ECF No. 16-8, at 73).  But Bennett testified she did not even know what grade 38 responsibilities entailed, (Bennett Dep. 199:4–12), and West said that Bennett does not perform any grade 38 duties.  (West Dep. 89:4–10).  Bennett's hours also changed from 6:00 a.m. to 2:30 p.m. to 7:00 a.m. to 4:30 pm (if she took a lunch break).  (Bennett Decl. ¶ 31). Bennett lost her telework privileges, as West ended telework for CCT employees in

February 2023, except for those with an ADA accommodation.  (West Dep. 17:11–24).

Bennett's new work area—right outside West's door—was an enclosed cubicle that

was in "disarray" and Bennett had to clean it herself.  (Bennett Dep. 170:6–10);

(Bennett Decl. ¶ 36); (Resp. To Mot. For Summ. J., ECF No. 16, at 25).  Keyes, who

accompanied Bennett to the meeting where she was informed of the transfer,

described the move as "retaliation."  (Bennett Dep. 165:14).

F

In April 2023, Bennett filed this lawsuit, alleging intentional race

discrimination, hostile work environment based on race[2] and retaliation claims under

Title VII and the PHRA.  (Am. Compl., ECF No. 3).  SEPTA moved for summary

judgment, and the Court held oral argument on January 16, 2024.  (ECF No. 21).  A day

later, Bennett filed a motion for relief pursuant to Federal Rule of Civil Procedure

56(d), asking the Court to (1) delay deciding the motion until SEPTA produced

Medernach's compensation and employment records, and (2) consider as part of the

record an application for accommodations under the ADA Bennett's filed December 6,

2023—after discovery had ended and SEPTA moved for summary judgment.  (ECF No.

25).

---

[2]     Bennett does not assert hostile work environment claims as separate counts in her amended complaint; rather, she mentions them as part of her intentional discrimination claims.  (ECF No. 3, ¶¶ 34, 40).  A plaintiff is the "master of her complaint," and Bennett may not defeat summary judgment by asserting a claim she did not include in her complaint.  *Summy-Long v. Pa. State Univ.,* 226 F. Supp. 3d 371, 387–88 (M.D. Pa. 2016), *aff'd,* 715 F. App'x 179 (3d Cir. 2017).  In any event, the amended complaint includes factual allegations supporting such a claim, SEPTA addressed it in its reply and both sides argued the issue during oral argument.  (Jan. 16, 2024 H'rg Tr. 2:10–3:19, ECF No. 23).  As such, the Court will consider the claim on the merits.

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and

inferences in the light most favorable to the non–moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III

Bennett contends that she was subject to intentional race discrimination under Title VII and the PHRA.[3] She contends specifically that she: (1) had her Fiscal Year 2021 merit increase reduced from 4.5% to 3.5% while Medernach, a white administrative assistant, did not; (2) she received a 3% merit increase in January 2022, but white men who held senior positions received higher raises; and (3) she was involuntarily transferred in March 2023 to a less desirable position, but other white administrative assistants were not.

The Court's inquiry is governed by the burden shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Under this analysis, the plaintiff must first carry the initial burden of establishing a *prima facie* case of discrimination, meaning: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

---

[3]     Bennett's Title VII and PHRA discrimination claims are analyzed under the same framework and the Court considers them together. *Rosencrans v. Quixote Enters.*, 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

If the plaintiff succeeds in establishing the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. The defendant satisfies this burden "by introducing evidence, which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable [action]." *Branch v. Temple University*, 554 F. Supp.3d 642, 649 (E.D. Pa. 2021) (internal quotation marks omitted). The defendant does not need to prove the offered reason was the actual reason for its decision. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010).

If the defendant articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is mere pretext. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff can show pretext by pointing to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764–65. "The plaintiff cannot simply show the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). Instead, the plaintiff "must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fennell v. Comcast Cable Communications Management, LLC*, 628 F. Supp.3d 554, 580 (E.D. Pa. 2022) (quoting *Fuentes* 32 F.3d at 765).

### A

Beginning with the reduced merit increase for Fiscal Year 2021, SEPTA contends that Bennett fails to establish her *prima facie* case because she did not suffer an adverse employment action, and even if she did, it was not done under an inference of discrimination.

### 1

The Third Circuit Court of Appeals has not stated definitely that an employee suffers an adverse employment action when a proposed, though not yet implemented, merit increase is reduced.  But on this record, coupled with holdings from other circuits and non-precedential Third Circuit decisions, that is likely the case here.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).  SEPTA argues that Bennett did not suffer an adverse action because the proposed merit increase was discretionary, not an entitlement and never finalized.  Therefore, the reduction was not an adverse action, especially given a less than expected merit increase is not an adverse employment action.  *See EEOC v. Wyeth Pharmaceutical*, No. 03-2967, 2004 WL 503417, at *2 n.3 (E.D. Pa. 2004).

However, Sauer's discretion to reduce Bennett's merit increase does not necessarily preclude a reasonable juror from finding an adverse employment action. *See Sala v. Hawk*, 481 F. App'x 729, 732 (3d Cir. 2012).  Bennett's Fiscal Year 2021 merit increase was not simply less than expected.  Her direct supervisor recommended it based on how he reviewed her 2020 performance.  Sauer, who neither supervised nor reviewed Bennett, then cut it back.  Sauer's decision was arguably akin to the denial of a performance based, discretionary bonus, which can constitute an adverse employment action.[4]  *See Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (holding that the district court erred in ruling that a denial or reduction of a bonus could not constitute an adverse employment action solely because the employer had discretion to pay a bonus); *Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) (holding that a negative evaluation which resulted in the denial of a purely discretionary bonus was an adverse employment action).

### 2

Bennett's discrimination claim fails because there is no record evidence indicating Sauer's decision to reduce Bennett's proposed 2021 merit increase had anything to do with her race.  Bennett cites no direct evidence of racial discrimination and pins her entire argument on her assertion that Medernach, another white administrative assistant, was treated differently.  (Resp. To Mot. For Summ. J., at 8–10); (Jan. 16 H'rg Tr. 51:24–52:3, ECF No. 23).

---

[4]     SEPTA's reliance on *Tucker v. Merck & Co., Inc.*, 131 F. App'x 852, 857 (3d Cir. 2005), is unpersuasive because the Third Circuit decided *Sala* seven years later and cited *Russell* with approval for the proposition that the "denial of a purely discretionary bonus constituted an adverse employment action."  *Sala,* 481 F. App'x at 732.

To show an inference of discrimination, plaintiffs may introduce evidence that comparators—similarly situated employees who are not members of the same protected class—were treated more favorably under similar circumstances. *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp.3d 571, 589 (E.D. Pa. 2017). "Similarly situated" does not mean identically situated, but the plaintiff must nonetheless be similar in "all relevant respects." *Collins*, 247 F. Supp.3d 571, 589 (E.D. Pa. 2017) (citing *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009)). This requires a showing that the relevant aspects of the plaintiff's employment situation are "nearly identical" to those of the co-workers that the plaintiff alleges were treated more favorably. *Id.* (citing *Hobson v. St. Luke's Hosp. & Health Network*, 735 F. Supp.2d 206, 214 (E.D. Pa. 2010)). Thus, showing that employees are similarly situated includes "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223. A plaintiff must show the other employee's acts were of "comparable seriousness" to her own infraction. *See Anderson v. Haverford College,* 868 F. Supp. 741, 745 (E.D. Pa. 1994). The relevancy of certain facts or circumstances for the purposes of the "similarly-situated" analysis is determined by the context of each case. *Collins*, 247 F. Supp.3d at 590.

Bennett claims that Medernach, a white Administrative Assistant II who did not have her proposed 4.5% merit increase reduced by Sauer, is a valid comparator. (Resp. To Mot. For Summ. J., at 8–9.) But Bennett failed to adduce any evidence to support that assertion. Bennett's belief that Medernach received a 4.5% raise for Fiscal Year

18

2021 is based on "rumors" and "her talking about it."[5]  (Bennett Dep. 142:23–143:7).

Bennett cannot claim Medernach is similar to her in "all relevant respects" because

there is nothing in the record which shows, *inter alia*, how Medernach was rated in her

annual reviews, what her proposed 2021 merit increase was and whether or not she

received the proposed increase.  Bennett hangs her hat on nothing more than rumors,

assumptions and speculations, none of which create questions of fact for a jury.[6]

---

[5]      As an initial matter, this is hearsay, and "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).  However, "hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*."  *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 239 (3d Cir. 2016) (emphasis in original).  Medernach was not among the ten people Bennett chose to depose, nor did Bennett move to compel discovery related to her compensation records.  Nothing in the record indicates whether Medernach could or would testify at trial.  *See, e.g., Tomaszewski v. City of Phila.*, 460 F. Supp.3d 577, 596 (E.D. Pa. 2020).  11 James Wm. Moore et al., *Moore's Federal Practice* § 56.91 (2023) ("Depending on the circumstances, the failure to secure sworn statements at the summary-judgment stage—or to confirm that the witnesses can and will testify as expected later—can significantly undercut the claim that the statements actually can be presented in an admissible form at trial.").

[6]      During discovery, Bennett sought from SEPTA "[c]omplete employment records, including but not limited to, performance evaluation records, payroll records, attendance records, compensation records of Mariellen Medernach."  (Def's Resp. To Pl's Req. For Docs., at 17).  SEPTA objected to the request claiming it was "ambiguous, vague, overbroad, and/or unduly burdensome" and sought "information/documentation which is protected by the attorney-client privilege and/or work product doctrine."  (*Id.*)

Bennett never sought the Court's intervention or moved to compel the production of those documents.  A defendant's failure to produce documents related to the plaintiff's claim is properly raised in the context of a motion to compel, not as a defense to summary judgment.  *See Finizie v. Peake*, 548 F. Supp.2d 171, 179 (E.D. Pa. 2008).

Bennett's motion for relief pursuant to Federal Rule of Civil Procedure 56(d) does not help her, either.  Under that rule:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1)  Defer considering the motion or deny it;
(2)  Allow time to obtain affidavits or declarations or to take discovery; or
(3)  Issue any other appropriate order.

Federal Rule of Civil Procedure 56(d).  "A request for relief under [Rule 56(d)] is extremely unlikely to succeed when the party seeking delay has failed to take advantage of discovery."  *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986).  And while Rule 56(d), which protects parties opposing

Without any evidence to show that Medernach is a valid comparator, and because inferences of race discrimination cannot arise from "speculations, generalities and gut feelings, however genuine," *Paradoa v. Phila. Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015) (internal quotation marks omitted), Bennett fails to establish her *prima facie* case.

3

Even if Bennett could make out a *prima facie* case, Defendants articulated a legitimate, non-discriminatory reason for Sauer's decision to change Bennett's merit increase and there is nothing in the record to indicate that reason was a pretext for racial discrimination.  All merit increases must be approved by each division general manager, the finance department and the general manager before they are finalized, and thus "managers are instructed not to divulge 'proposed' or 'preliminary' increase amounts."  (SAM FY 2021 Merit Increase, ECF No. 15-20, at 2).  Pursuant to this policy, Sauer changed Bennett's merit increase—before it was finalized—to come under budget, which he had discretion to do every year, apparently at random, for as many as 100 SEPTA employees of "all different races, all different genders, all different pay grades and levels."  (Sauer Dep. 30:17–23, 102:6–103:3).

---

summary judgment when, *for valid reasons,* they cannot present facts essential to justify their opposition to the motion, the rule is not intended to reward parties who have been "lazy or dilatory." *See* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Prac. & Proc. § 2740 (4th ed. 2023) (emphasis added).

Bennett filed her 56(d) declaration nearly three months after fact discovery closed, two months after SEPTA filed its motion for summary judgment and the day after the Court held oral argument on the pending motion—after counsel perhaps began to realize his case's shortcomings. Here, counsel failed to use mechanisms available during discovery.  *See, e.g., Banks v. City of Phila.*, 309 F.R.D. 287, 293 n.3 (E.D. Pa. Aug. 14, 2015) ("[T]he rule is not intended to protect those who have had an opportunity to complete discovery, but failed to do so by their own lack of diligence.").

Rather than point to any evidence which could demonstrate any inconsistencies, weaknesses or contradictions with respect to the reason for the reduction, *Fuentes,* 32 F.3d at 764–65, Bennett complains, belatedly, that Medernach's compensation records were not produced and contends that Sauer's budgetary reasons are simply a "new explanation" provided for the first time during litigation.  (Resp. To Mot. For. Summ. J., at 27).  Bennett's argument and reliance on *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004), is unpersuasive.  In *Ridge*, the court noted a logical impossibility in the employer's proffered explanation that the "best qualified" candidate was selected because the candidate who was ultimately chosen was not under consideration at the time the plaintiff was rejected.  *Id.* at 318.  This indicated the employer's explanation "*could not have motivated* the employer" at the time the decision was made.  *Id.* (emphasis in original).  Here, Sauer said he adjusts, for budgetary reasons, the proposed merit increases for many employees every year, and nothing in the record calls that explanation into question.

B

Bennett next contends that the 3% salary increase she received for Fiscal Year 2022—higher than her 2015, 2017, 2018 and 2019 raises and .5% less than her increase for 2021—was discriminatory because Mike Civera and Ed Carruthers, white men with positions senior to Bennett's, received "Exceeds Expectations" reviews and higher increases.[7]

---

[7] Similar to Medernach's alleged merit increase, Bennett's assertion as to Civera and Carruthers's increases is based on "rumors."  (Bennett Dep. 276:20–277:13).

Unlike her Fiscal Year 2021 increase, there is no evidence the Fiscal Year 2022 increase was reduced or a recommendation was denied, and the receipt of a less than expected merit increase is not an adverse employment action.[8]  *See Tourtellotte v. Eli Lilly and Co.*, 636 F. App'x 831, 845 (3d Cir. 2016).  Even if getting a smaller raise than she wanted or expected could constitute an adverse employment action, Bennett fails to show how it occurred under an inference of discrimination.  Again, without pointing to any direct evidence of discrimination and relying on the rumor mill, Bennett cites Civera and Carruthers as "comparators."  But comparators must be similar in "all relevant respects." *Collins*, 247 F. Supp.3d at 589.  Civera and Carruthers had different jobs than Bennett: Civera is currently a Program Manager for SEPTA's Zero Emission Bus Transmission and was previously the Senior Director of Maintenance in the Southern Division; Carruthers was a director.  (Civera Dep. 6:16–24); (Bennett Jan. 12 email to Deiger, at 42).  Although Bennett claims that, like Civera and Carruthers, she also performed two jobs during 2021, they are not valid comparators because they had different job duties and responsibilities.

And even if Bennett established her *prima facie* case, there is a legitimate, non-discriminatory reason SEPTA gave her the 3% increase for 2022.  Bennett was out on sick leave throughout the fall of 2021, which was when the merit consideration process occurred.  As such, according to SEPTA policy, Bennett received the average percentage for employees with a "Meets Expectations" rating.  (Deiger Dep. 37:11–22, ECF No. 16-5).

---

[8]      In a footnote, *Tourtellotte* did not rule out the possibility that in the retaliation context—as opposed to a discrimination claim—the receipt of a less than expected merit increase "could rise to the level of an adverse employment action."  636 F. App'x at 845 n.26.

In response, Bennett contends that Stephanie Deiger, the Chief Human Resource Officer, and James Fox, an Assistant General Manager, both used more sick time than she did and yet received higher merit increases. (EEOC Rebuttal Letter, ECF No. 16-7, at 53). Even if Bennett's speculation amount their amount of sick leave is correct, there is no evidence as to what Deiger and Fox's increases actually were, and, in any event, both held more senior positions than Bennett, making them invalid comparators. Bennett must do more than argue SEPTA's decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765. Because she offers no evidence of inconsistencies, implausibilities or contradictions, no reasonable juror could find SEPTA's reason for the 3% merit increase unworthy of credence. *Id.*

## C

Finally, SEPTA contends that Bennett fails to establish her *prima facie* case for alleged racial discrimination pertaining to her March 2023 transfer to CCT because it was not an adverse action. And even if it was, there is nothing to suggest the move was related to Bennett's race. SEPTA also proffers a legitimate, non-discriminatory reason for the transfer and Bennett cannot show pretext.

## 1

An adverse employment action is one that affects the compensation, terms, conditions or privileges of employment, *Jones*, 796 F.3d at 326, and transfers may establish the third element of a *prima facie* race discrimination claim where the new position is shown to be detrimental or undesirable in an objective way. *Jones*, 198 F.3d at 411–12. While the transfer did not affect Bennett's pay or pension, she generally

23

viewed the CCT position as less desired, her hours changed and her telework privileges—which had previously been granted and were set to expire in 2025—ended. (Bennett Decl. ¶ 34).  As such, reasonable jurors could find she suffered a tangible change to the terms and conditions of her employment.  *See Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) ([T]ransfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse [employment] action.").

2

Bennett fails, however, to show how the March 2023 transfer occurred under the inference of discrimination.  Bennett contends, relying again solely on comparator evidence, that Medernach, Michelle Fisher, Julia McCauley, Eleanor Stinger, Nancy Granozio-Mazzuca, Janet Looby, and Lynn Rohr, all white administrative assistants with less seniority in the Operations Division under Sauer's chain of command were not involuntarily removed from their positions and reassigned to CCT.  (Bennett Decl. ¶ 32).  But all these alleged comparators—at least as of April 2021—reported to different managers.[9]  Medernach reported to Josh Gottlieb, Fisher reported to Kate O'Connor, McCauley reported to Kim Kennedy and Chrystalle Cooper, Granozio-Mazzuca reported to Leonard Nardone and Jack McElwee, Looby reported to Kevin O'Brien, Rohr reported to Nick Grieshaber and Martha Behan.  (Administrative Assistants Phone List, ECF No. 16-8, at 7–8).  The record does not indicate who Eleanor Stinger reported to, but at least as of April 2021, it was not Brennan.  (*Id.*)

---

[9]     The record does not indicate if they any of these women have since changed positions, but at the very least, they did not work for Brennan at the time he went out on sick leave in June 2021.

Moreover, there is no evidence these alleged comparators were similarly unsupervised.  When Brennan left, Bennett was temporarily supervised by Civera and McAnulla, but then permanently reported to Sauer, who already had an administrative assistant.  Given the nature of her position, there is not much she can do without a manager directly supervising her.  (Sauer Nov. 21 email, ECF No. 15-41, at 2).  With different managers and different circumstances, they are not similar in "all relevant respects" and thus not valid comparators.  *Collins,* 247 F. Supp.3d at 589.  Without any other evidence, no reasonable juror could find Bennett's March 2023 transfer had anything to do with her race.

3

Even if Bennett established the *prima facie* case for intentional race discrimination regarding her March 2023 transfer, SEPTA offered a legitimate, non-discriminatory reason for the move.  Bennett's previous position under Brennan "did not exist anymore," and Bennett worked without a direct manager for over a year.  (Sauer Dep. 60:1–21).  Sauer said he had "no need for a second AA and it's not fair to Deborah to continue having her work with little to no direction.  She's completing her routine work but there's really nothing else for her to do without a manager directly supervising her."  (Sauer Nov. 21 email, ECF No. 15-41, at 2).  A few months later, Sauer reiterated this belief to Carol O'Neal, Thomas Comber and Stephanie Deiger, where he said Bennett "needs to be relocated to another management center.  Her supervisor's position is eliminated.  I don't want to let another year go by where she's working unsupervised."  (Sauer Feb. 1 email, ECF No. 15-43, at 2).  Soon thereafter,

Bennett was transferred to CCT to work under West, who needed an administrative assistant.

Bennett contends that SEPTA's stated reason for the transfer is pretextual because after SEPTA reorganized departments and combined Vehicle Maintenance and Vehicle Engineering to form the Railroad, Engineering, Equipment and Maintenance Department, Sachit Kakkar took over as the Deputy Chief Operation Officer and hired Lauren Guinan as his administrative assistant in August 2023. (Bennett Decl. ¶ 35). Bennett claims that Guinan's position is the one she occupied before being transferred to CCT and says she could have been the administrative assistant for Kakkar and worked her old hours with telework privileges. (Bennett Decl. ¶ 35).[10]

Again, however, the record is at odds with whichever of Bennett's shifting positions she wishes to rely on. Bennett's old position did not exist—she did not have a direct manager since Brennan left and the Vehicle Equipment Maintenance Department, where she formerly worked, no longer existed in its previous form.[11] (Sauer Dep. 60:4:21); (O'Neal Dep. 19:7–11, ECF No. 16-5). Showing pretext is a "difficult burden" that Bennett has not met, as she has failed to demonstrate any weaknesses, implausibilities or inconsistencies in SEPTA's proffered reason for the transfer. *Fuentes*, 32 F.3d at 765.

---

[10]    Bennett executed her declaration over a month after her deposition and a week and a half after SEPTA filed its motion for summary judgment. "A plaintiff cannot avoid summary judgment by simply relying upon a self-authored declaration that relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony." *See Njos v. United States*, No. 15-0931, 2017 WL 6949812, at *4 (M.D. Pa. 2017).

[11]    Guinan was hired in August 2023, five months after Bennett's transfer to CCT. The position was posted, the hiring process was competitive and Bennett apparently did not apply. (Sauer Decl., ECF No. 17-1, at 2).

IV

Bennett also contends she was subjected to a hostile work environment based on race because Sauer "berated her, falsely accused [her] of overcharging, and stealing overtime hours, and belittled and embarrassed [her]." (Resp. To Mot. For Summ. J., at 13–14). Bennett contends that Sauer treated her "like a child," and did not treat any of the white employees in the same way. (*Id.* at 14, 17).

To succeed on her claim, Bennett must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) *respondeat superior* liability exists.[12] *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990), *superseded in part by statute as recognized in Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206 (3d Cir. 2017). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

---

[12] Hostile work environment claims pursuant to Title VII and the PHRA involve the same analysis. *See, e.g., LaRochelle v. Wilmac Corp.*, 769 F. App'x 57, 61 (3d Cir. 2019).

A

Bennett's hostile work environment claim fails for the same reason her discrimination claim fails—nothing in the record shows she was subject to intentional racial discrimination.

Bennett baldly asserts that other white, female workers were not treated the same way by Sauer, (Jan. 16, 2024 H'rg Tr. 63:11–14), but the record does not corroborate that assertion.[13]  In a contradiction fatal to her claim, Bennett testified that everyone—regardless of race—was bullied by Sauer, including white men Dennis McAnulla, Mike Civera and Rob Zigler.  (Bennett Dep. 149:2–150:21); (Bennett Oct. 8 email, ECF No. 16-7, at 17).

More to the point, Bennett did not think Sauer confronted her based on any racial animus.  Prior to filing her internal EEO complaint, Bennett said she felt she was "subject to an atmosphere of workplace harassment and intimidation from Scott Sauer . . . as a result of the ongoing conflict between himself and my supervisor, Joseph Brennan[.]"  (Bennett July 1 email to Hopkins, ECF No. 16-6, at 12).  She continued: "I

_____

[13]     As an initial matter, it is unclear who Bennett is referring to as "all the other female and Caucasian employees in the department that [Sauer] . . . did not yell at."  (Jan. 16, 2024 H'rg Tr. 63:19–23).  If Bennett is referring to Trayia Hill, Jessica Herman and Leslie Moore, Bennett did not show any of them were valid compactors.  In fact, Hill and Moore are also black.  (SDMF, ¶ 35, ECF No. 16–1).  And if the purported comparators are Medernach, Michelle Fisher, Julia McCauley, Eleanor Stinger, Nancy Granozio–Mazzuca, Janet Lobby and Lynn Richard, Bennett refers to them in the context of not being involuntarily removed from their positions and reassigned to CCT.  As of April 2021, only Medernach and McCauley worked in Operations.  (Administrative Assistants Phone List, ECF No. 16-8, at 8).  More importantly, there is no evidence they were engaged in similar conduct as Bennett, namely, logging significant overtime hours.  (Bennett Decl. ¶ 32); *Anderson*, 868 F. Supp. at 745.  Finally, if she is referring to Alexanna Cruz or Leonides Ramos, (EEOC Rebuttal Letter, ECF No. 16-7, at 53), she only mentions them in the context of covering her work while she was on sick leave, and the record does not indicate who they reported to or whether they were also engaged in similar conduct as Bennett.

believe AGM Scott Sauer has had a dislike for me since February 29, 2020 Ambassador duty for the Philadelphia Flower Show," and she concluded the letter by saying, "The incidents with the Overtime, Flower Show, and Merit Decrease have felt like I have been hit with multiple punches that are directed at me as a result with AGM Sauer's conflict with Joseph Brennan." (*Id.* at 13). In her EEO complaint, she attributed the incident to "collateral damage for my supervisor Joseph Brennan, harassment & retaliation for flower show." (July 6 EEO Complaint, ECF No. 16-6, at 18). The Court cannot recall a claim of racial discrimination or hostile work environment based on race where the plaintiff's stated reasons for the defendant's conduct had nothing to do with race.

## B

Even if Bennett did face intentional discrimination, it was neither severe nor pervasive enough to constitute a hostile work environment. Severe or pervasive behavior "alter[s] the conditions of employment and create[s] an 'abusive working environment.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are inadequate. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Hardly "altering the conditions of employment," the alleged discrimination could not have been pervasive because Bennett had little, if any, contact with Sauer after the June 22 meeting. Bennett said, "I never see him" after she returned from her sick leave in December 2021 through March 2023. (Bennett Dep. 156:9–15). Sauer said, "[a]side

29

from a few emails from Deborah requesting time off, I haven't really had much interaction with her."  (Sauer Nov. 21 email, ECF No. 15-41, at 2).

Moreover, Bennett's allegation that Sauer yelled at her pales in comparison to other conduct that courts have *still* found insufficiently severe to create an abusive work environment.  *Compare LaRochelle v. Wilmac Corp.,* 210 F. Supp. 3d 658, 694 (E.D. Pa. 2016), *aff'd,* 769 F. App'x 57 (3d Cir. 2019) (holding actions were not sufficiently severe or pervasive where a co-worker refused to work with plaintiff because of her nationality and the way she spoke English, another co-worker called her a "stupid immigrant" and "bitch" and said all aliens should return to their countries, and the manager tolerated these comments, assigned plaintiff the more difficult assignments and accused plaintiff of faking injuries); *Harbor Bar & Brasserie Restaurant*, 386 F. App'x. 352, 354 (3d Cir.2010) (finding reference to the plaintiff as a "Haitian F—k," while "unpalatable and inappropriate," was not sufficiently severe or pervasive to support a hostile work environment claim); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607–11 (E.D. Pa. 2001) (granting summary judgment for employer on a hostile work environment claim where supervisor made racist comments, including calling the black community a "baby factory," saying blacks were incapable of thinking analytically, and warning the plaintiff, who was black, not to talk to white women).

## V

Finally, Bennett brings retaliation claims under Title VII and the PHRA. Bennett contends she engaged in numerous instances of protected activity, and as a result, suffered multiple adverse employment actions.  To establish a *prima facie* case for retaliation, Bennett must prove: (1) she engaged in protected activity; (2) she

suffered an adverse employment action; and (3) causal connection between the protected activity and the adverse employment action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

If Bennett establishes the *prima facie* case, the burden shifts to SEPTA to advance a legitimate, non-discriminatory reason for its conduct; if it does so, Bennett must be able to convince the factfinder both that the proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). While Bennett must ultimately "prove that retaliatory animus was the 'but-for' cause of the adverse employment action," in proving the *prima facie* case, she only "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017).

### A

SEPTA first contends that Bennett fails to establish the *prima facie* case because she never engaged in protected activity; Bennett points to six specific instances of her doing so: (1) her July 6, 2021 internal EEO complaint; (2) the October 8, 2021 complaint to Oduok that the SEPTA EEO investigation was biased; (3) her November 5, 2021 complaint to the PHRC; (4) the January 4, 2022 email to Stephanie Deiger stating she had not received a merit increase; (5) her January 12, 2022 complaint to Deiger about

31

her 3% merit increase; and (6) her March 25, 2022 EEOC charge of race discrimination.[14]

Title VII prohibits discrimination against an employee because she "opposed . . . an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000e-3(a). "[T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings ('the participation clause') and those who oppose discrimination made unlawful by Title VII ('the opposition clause')." *Moore*, 461 F.3d at 341.

"Protected activity" includes not only formal charges of discrimination, but also informal complaints of discrimination. *Id.* at 343. But an employee is entitled to statutory protection under Title VII and the PHRA only if the employee acts based on an objectively reasonable belief that the conduct alleged actually constituted an illegal form of discrimination. *See Toth v. California Univ. of Pennsylvania*, 844 F. Supp.2d 611 (W.D. Pa. 2012). If no reasonable person could have believed that the underlying incident complained about by an employee constituted unlawful discrimination, then the employee's complaint cannot be the basis for liability for retaliation. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315 (3d Cir. 2008). "[W]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes

---

[14]    Though she does not mention it, Bennett's November 21, 2022 EEOC rebuttal letter could also constitute protected activity and the Court considers that as well. *See, e.g., Mentor v. Hillside Bd. of Educ.*, No. 08-1173, 2009 WL 2413636, at *5 (D.N.J. Aug. 5, 2009).

the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009).

All of Bennett's alleged protected activities were either formal charges of discrimination or informal protests of discriminatory practices communicated to management.  The July 6, 2021 internal EEO complaint, November 5, 2021 PHRA complaint and March 2022 EEOC complaint are based on the belief Sauer discriminated against her by reducing her merit increase but not Medernach's. Bennett's October 8, January 4 and January 12 emails constituted informal protests stemming from her participation in protected activity or new protests of discriminatory conduct.  The October 8, 2021 email to Oduok pertains to her involvement and participation in the internal investigation into the allegations in the July 6 complaint. On January 4, 2022, Bennett complained about not receiving her merit increase and noted that "based on the discriminatory, retaliatory and biased treatment that I have endured at the hands of AGM Scott Sauer," she did not trust him to give her a fair merit increase for that year.  (Bennett Jan. 4 email to Deiger, ECF No. 16-7, at 34). And on January 12, Bennett disagreed with her 3% merit increase, noting that other white men received higher performance evaluations than her.  (Bennett Jan. 12 email to Deiger, ECF No. 16-7, at 42).  A reasonable juror could find Bennett had an objectively reasonable belief that discriminatory conduct had occurred when she heard "rumors" that another white administrative assistant did not have her 4.5% merit increase reduced, or that other white men received a better review than her for performing two jobs, even if such conduct did not actually violate Title VII.  *See, e.g., Mitchell v. Miller*, 884 F. Supp.2d 334, 378 (W.D. Pa. 2012).

B

SEPTA next contends that Bennett did not suffer any adverse employment actions relating to her retaliation claims.  To satisfy the second prong of the *prima facie* case, Bennett must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  *Daniels,* 776 F.3d at 195.  However, the action must be material, meaning more than just "petty slights, minor annoyances, and simple lack of good manners." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Bennett contends the following events constituted adverse employment actions: (1) Sauer still wanted her to perform extra work without overtime pay in late July/early August 2021; (2) her 3% merit increase for Fiscal Year 2022 was delayed; and (3) she was involuntarily transferred to CCT, denied telework privileges, had her hours changed and was relegated to a messy office in March 2023.

1

Bennett claims that in late July/early August 2021, Sauer wanted her to continue doing additional duties without overtime.  Imposing a higher workload, particularly when those responsibilities come without additional pay, could dissuade a reasonable worker from making or supporting a charge of discrimination and constitute an adverse employment action.  *See Homel v. Centennial Sch. Dist.,* 836 F. Supp.2d 304, 324 (E.D. Pa. 2011).

34

However, the record shows that SEPTA was trying to reduce Bennett's workload, not add to it.[15]  Sauer met with Bennett to scale back her workload and overtime hours, (Sauer Dep. 55:9–21), and that is why Moore followed up with Bennett and asked if she could "help alleviate the load."  (Moore June 22 email to Bennett, ECF No. 15-29, at 2). Indeed, Civera said that SEPTA was finding "ways to justify reducing the load of her work so she wouldn't have to be forced to work overtime."  (Civera Dep. 26:8–27:6).  For instance, Sauer wrote, "I offered Deborah assistance from Operations Admin in prioritizing her work.  She was told not to worry about mistakes that she was correcting from Desiree Saunders."  (Late July/Early August 2021 emails, ECF No. 16-6, at 25). Dennis McAnulla told Bennett, "You no longer have to keep [COVID spreadsheets]," (*id*. at 29), as did Jessica Herman, "We don't need regular spreadsheets."  (*Id*. at 28). Although Bennett felt there was "no consistency in what I'm supposed to be doing," (Bennett Aug. 12 email, ECF No. 16-6, at 30), McAnulla, Bennett's supervisor at the time, said:

> I told Deborah that until further notice that she couldn't work the overtime and I asked Deborah to start to justify and write down her daily job duties, what she was doing each day and the amount of work that she was performing each day so we can provide a justification to support the need for overtime.
>
> And at that point Deborah chose that she didn't want to work the overtime and she didn't I guess want to provide me the justification, so that was kind of the end of it.

---

[15]     But to the extent Bennett performed additional work, she received 16 overtime hours in August and 8.5 in September.  (Bennett Overtime Hours, ECF No 15-22, at 2).

(McAnulla Dep. 15:16–16:8).  No reasonable juror could find that SEPTA's decision to eliminate unnecessary work and better manage Bennett's overtime hours would dissuade a reasonable worker from making or supporting a charge of discrimination.

Even if a genuine issue of fact remains as to whether the circumstances amounted to an adverse employment action, a reasonable juror would be unable to infer that Bennett's protected activity caused the reduced overtime and change in workload. Causation can be shown in various ways such as offering evidence of an inconsistent explanation for taking an adverse action, a pattern of antagonism, or temporal proximity that is "unusually suggestive of a retaliatory motive." *Carvalho-Grevious*, 851 F.3d at 260 (citing *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000)).  The record evidence, taken as a whole, may also suffice to show causation. *Id.*

Here, however, concerns about Bennett's overtime hours and work responsibilities predated her July 6 internal complaint, precluding Bennett from being able to show that her EEO complaint was the likely reason for the changes. *See* (Sauer Dep. 45:1–6); (Moore June 22 email to Bennett, ECF No. 15-29, at 2).

2

Next, Bennett alleges the delayed receipt of her 3% merit increase for Fiscal Year 2022 was retaliatory.  A delay in receiving an annual salary increase, particularly one that was lower than the preceding year's, could dissuade a reasonable worker from making or supporting a charge of discrimination.[16] *See Johnson v. District of Columbia*,

---

[16]    Because the "adverse action" in retaliation claims is broader than the "adverse action" required for disparate treatment claims, a less than expected merit increase may be an adverse action in the retaliation context, unlike the disparate treatment context. *See Tourtellotte*, 636 F. App'x at 845 n.26.

947 F. Supp.2d 123, 135 (D.D.C. 2013) ("If a pay raise is considered objectively tangible, then by extension the denial or delay of a pay raise would be an objectively tangible harm."); *McQuilkin v. Delaware River Port Auth.*, No. 11-652, 2013 WL 5936983, at *15–17 (D.N.J. Nov. 6, 2013) (finding that delay in implementing a raise was an adverse action in the retaliation context).

But there is no record evidence to establish an inference that her protected activity was the likely reason for the delayed merit increase or the amount she eventually received. *See Carvalho-Grevious*, 851 F.3d at 258–59. Bennett's last protected activity before the salary increase kerfuffle was on November 5, 2021, and the record does not indicate when the Fiscal Year 2022 increases were supposed to take effect. This dooms her causation argument right off the bat. But even considering the prior year's timetable, Bennett cannot show temporal proximity. For Fiscal Year 2021, the merit plan was approved and effective on November 29, 2020, and the check date was December 18, 2020. (SAM FY 2021 Merit Increase, 15-20, at 1). Assuming similar timing for Fiscal Year 2022, Bennett's PHRC complaint was filed almost four weeks prior to the merit plan *potentially* being finalized and two months before she contacted Deiger, too long to be unduly suggestive and does not, on its own, establish causal connection. *Compare Blakney v. City of Phila.,* 559 F. App'x 183, 186 (3d Cir. 2014) ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive."); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding a period of three weeks not unusually suggestive on its own); *Kier v. F. Lackland &Sons, LLC*, 72 F. Supp.3d 597, 617 (E.D. Pa. 2014)

37

(observing that temporal proximity is measured in days, rather than weeks or months, to suggest causation without corroborative evidence), *with Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unusually suggestive).

Moreover, no alleged pattern of intervening antagonism occurred between the PHRA complaint in early November and Bennett's email to Deiger on January 4, 2022. *Compare Woodson v. Scott Paper Corp.*, 109 F.3d 913, 920 (3d Cir. 1997). Bennett's purported pattern of antagonism is more akin to "interpersonal workplace strife" than the kind of antagonism recognized in this Circuit. *See Patel v. Shinseki*, 984 F. Supp.2d 461, 478 (W.D. Pa. 2013). By comparison, in *Robinson v. Se. Pa. Transp. Auth.*, the plaintiff, a SEPTA bus driver, filed a union grievance after a co-worker made a racially offensive comment and his supervisor became "verbally abusive" during the plaintiff's conversation about the alleged comment. 982 F.2d 892, 895 (3d Cir. 1993). After the plaintiff filed the union grievance, his relationship with his supervisors deteriorated. *Id.* Supervisors repeatedly disciplined him for minor matters, subjected him to a constant barrage of written and verbal warnings, miscalculated his points for absences from work, and generally tried to provoke him. *Id.* at 894–95.

In contrast, Bennett was never subject to discipline, verbal abuse or racially charged comments after she engaged in protected activity. Instead, her gripes are more akin to "petty intra-office squabbles" that do not suffice to establish causation. *See Martinez v. Rapidigm, Inc.,* 290 F. App'x 521, 526 (3d Cir. 2008). She was not "set up to fail," *Woodson*, 109 F.3d at 921, nor did Sauer, or any other employees, engage in a "witch hunt" to get rid of her. *See Branch*, 554 F. Supp.3d at 657. Bennett had been out on sick leave from September 9 until December 8, 2021. (Bennett Decl. ¶ 18).

38

When she returned to work, she only worked on Mondays until the end of the year. (Bennett Dec. 8 email to Herman, ECF No. 16-7, at 32).  Even taking the record as a whole, since June 2021, SEPTA had been trying, for budgetary reasons, to reduce Bennett's overtime hours and workload.  In short, no reasonable juror could infer that her protected activity caused a delay in her 2022 merit increase.

But even if Bennett established the *prima facie* case for retaliation, as discussed more fully *supra* subsection III.B, merit increases are contingent on performance reviews, and because Bennett had been on sick leave, she was not reviewed or included on the merit sheet.  Still, she received a 3% merit increase in accordance with SEPTA policies, (Bennett Dep. 185:11–15, 200:8–22), and Bennett points to nothing in the record which could show that SEPTA's adherence to these policies was a pretext for retaliation.

3

Finally, Bennett contends that her involuntary transfer, change in hours, denial of telework privileges and messy office were retaliatory adverse employment actions. As discussed *supra* subsection III.C.1, Bennett's transfer, coupled with the other changes to the conditions of her employment, could dissuade a reasonable employee from making a report of discrimination.  *See Jones*, 198 F.3d at 411–12 (3d Cir. 1999).

Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, causation may be inferred.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).  Bennett filed her EEOC charge in March 2022 and a rebuttal letter on November 21, 2022—the same day Sauer

first emailed O'Neal and Comber about transferring Bennett.  *See* (Sauer Nov. 21

email, ECF No. 15-41, at 2).  This timing is unusually suggestive of causation.  *See, e.g.,*

*Jalil*, 873 F.2d at 708.

But SEPTA offered legitimate non-discriminatory reasons for the transfer and

denial of telework privileges that Bennett has failed to show are pretextual.  As

discussed more fully *supra* subsection III.C.3, Sauer did not need a second

administrative assistant and Bennett was working without a manager directly

supervising her.  (Sauer Nov. 21 email, ECF No. 15-41, at 2).  Sauer even said, "I don't

want another year to go by where she's working unsupervised," (Sauer Feb. 1 email,

ECF No. 15-43, at 2), and Bennett failed to offer any evidence SEPTA "did not act for

the [asserted] non-discriminatory reasons," *Fuentes,* 32 F.3d at 765, or that her

protected activity was the but-for cause of the transfer.[17]

SEPTA also offered a legitimate, non-discriminatory reason for the denial of

telework privileges, namely, that West changed the telework standards for all CCT

employees in February 2023, prior to Bennett's arrival.  In fact, she sent a memo about

the change in late January 2023, over a month before Bennett was transferred.  (West

Dep. 17:11–19:16).  The few employees who were still able to telework were allowed to

---

[17]     Keyes's apparent conclusory statement that "we all know this is retaliation" is inadmissible under Federal Rule of Evidence 701 because the jury would be in just as good a position to decide if the transfer was retaliation or not.  Only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment.  *See, e.g., Bender v. Norfolk Southern Corp.*, 994 F. Supp.2d 593, 600 (M.D. Pa. 2014).  And in applying Rule 701(b) to testimony regarding an employer's motivations, courts have held that a "witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant was motivated by an impressible animus." *See Connearney v. Main Line Hospitals, Inc*., 2016 WL 6569326, at *4 (E.D. Pa. Nov. 4, 2016) (quoting *Hester v. BIC Corp*., 225 F.3d 178, 185 (2d Cir. 2000)).

do so because they had ADA accommodations—which Bennett did not.[18]  (*Id.* at 82:3–85:8).

    An appropriate Order follows.

                              BY THE COURT:

                              ***/s/ Gerald J. Pappert***

                              GERALD J. PAPPERT, J.

---

[18]    There is no record evidence showing this reason is pretextual.  Months after West's deposition, SEPTA's motion for summary judgment and oral argument, Bennett filed a motion pursuant to Federal Rule of Civil Procedure 56(d) asking the Court to consider her December 6, 2023 application for ADA accommodations, which apparently remains pending.  (Mot. For Relief Pursuant to Rule 56(d), ECF No. 22, at 3–4).  Bennett contends her application is relevant to show pretext because another employee, Rhoshina Stewart, was immediately approved for telework while her ADA request was being processed, but Bennett did not get the same treatment.  (*Id.*)

    "Where the information sought is not relevant to the court's inquiry, a Rule 56(d) motion for discovery may be denied."  *In re Taylor*, 548 F. App'x 822, 825 (3d Cir. 2013) (citing *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987)).  Moreover, in a summary judgment motion, a fact is material if proof of its existence or nonexistence "might affect the outcome of the suit."  *Id.* (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012)).

    Bennett's proffered information about her recent, pending ADA accommodations application is not relevant to the Court's inquiry because West testified that employees in CCT who were allowed to telework had ADA accommodations, and because Bennett did not (and still does not) have ADA accommodations, she was not permitted to telework.  (West Dep. 82:3–85:8).  Therefore, it is irrelevant in attempting to establish pretext for a decision made many months prior if now, after discovery and the motion for summary judgment was filed, Bennett applied for an ADA accommodation.